TERRY SCANNELL, OSB #853220
Attorney at Law
7128 SW Gonzaga St., Ste. 220
Portland, Oregon 97223
Telephone: (503) 789-6566
Email: terry@scannellaw.com

Attorney for Plaintiff Terri Kwake

Amy Edwards, OSB No. 012492
amy.edwards@stoel.com
Crystal S. Chase, OSB No. 093104
crystal.chase@stoel.com
Kennon Scott, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Attorneys for Defendant Select Portfolio Servicing, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

TERRI KWAKE, an individual and citizen of the State of Oregon,

Plaintiff,

v.

SELECT PORTFOLIO SERVICING, INC.; a Utah Corporation,

Defendant.

Case No.: 6:15-CV-01713-MC

PRETRIAL ORDER

The following pretrial order is lodged pursuant to LR 16.6.

## I. NATURE OF ACTION

This is an action for damages under three state law claims: (1) breach of contract, (2) common law fraud, (3) Oregon Unfair Trade Practices Act. There are no federal claims in the case. Trial in this case will be by jury.

## II. BASIS FOR FEDERAL JURISDICTION

Federal Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332.

## III. AGREED FACTS

*Facts marked with an asterisk (*) are agreed to but disputed as to relevance.*

A. Defendant Select Portfolio Servicing ("SPS") is the current servicer for a residential loan ("Loan") to Plaintiff Terri Kwake ("Plaintiff") for residential property commonly known as 25951 Highway 38 Chershire, Oregon 97419 ("Property").

B. On or about July 26, 2012, Bank of America, N.A. ("BANA") informed Plaintiff Terri Kwake ("Plaintiff") that servicing for the Loan would be transferred to a new servicer, Defendant Select Portfolio Servicing, Inc. ("SPS") effective August 16, 2012.

C. On or about August 7, 2012, SPS sent Plaintiff a letter informing her that servicing of her Loan was transferring from Bank of America, N.A. ("BANA") to SPS effective August 16, 2012.

D. On October 17, 2012 SPS sent Plaintiff a letter entitled "Notice of Default - Right to Cure."*

E. On September 26, 2013, RRReview, at the request of SPS, completed an Exterior-Only Inspection Residential Appraisal Report that indicated a market value of the Property as of September 26, 2013 of $256,500.*

F. On or about October 9, 2013, SPS sent Plaintiff a letter regarding the National Mortgage Settlement ("NMS") program.

G. BANA, not SPS, was a party to the NMS Settlement Program.

H.  On or about November 6, 2013, a Loan-to-Value (LTV) calculation was run by SPS to determine the eligibility for Plaintiff's Loan for the NMS program. The value of the property used to make this determination was $388,000.

I.  On or about November 19, 2013, Plaintiff received a letter from SPS stating that it was "in the process of evaluating" her for the NMS program and requesting additional information from her.*

J.  On or about December 3, 2013, SPS conducted a "NMS Denial Review." The review shows that the denial "Pass[ed]" the review, meaning Plaintiff did not qualify for the NMS.

K.  On or about December 4, 2013, SPS sent Plaintiff a letter telling her she did not qualify for the NMS because the loan to value ratio "must be greater than 100% to qualify[.]"

L.  On December 4, 2013, SPS sent Plaintiff a letter captioned "Foreclosure Avoidance Measure Notice."*

M.  The Plaintiff (or her husband) and SPS had phone calls regarding the NMS modification on 11/26/2013, 12/30/2013, 01/30/2014.*

N.  On March 17, 2014 the Plaintiff sent a letter to her lawyer contesting the use of $388,000 by SPS as the property value, and enclosing additional information reflecting Plaintiff's view of the property value, which Plaintiff asserted in the letter to be less than $388,000.

O.  At a time currently unknown to the Plaintiff, the March 17, 2014 letter was forwarded to SPS.

P.  On or about March 31, 2014, RRReview conducted a broker price opinion which reflected a "Quick Sale 'As-Is'" value of $320,000 and a "90 - 120 Days 'As Is'" value of $330,000.*

Q.  On or about April 19, 2014, RRReview conducted another BPO which reflected a "Quick Sale 'As-Is'" value of $190,000 and a "90 - 120 Days 'As Is'" value of $210,000, and included an "Estimated Repairs" value of $10,000.*

R.  On or about June 13, 2014, Plaintiff sent a letter to SPS which summarized her perspective of some of the communication she and her husband had had with SPS.*

S.  On or about July 27, 2014 RRReview conducted another BPO which reflected a "Quick Sale 'As-Is'" value of $320,000 and a "90 - 120 Days 'As Is'" value of $330,000.*

T.  On or about September 26, 2014 the amount needed to reinstate the Loan was $125,367.52.*

U.  On or about October 11, 2014, SPS conducted a "Proposed Evaluation."*

V.  On or about October 14, 2014, SPS sent the Plaintiff a proposed loan modification agreement.

W.  On or about October 24, 2014, the Plaintiff signed the modification agreement, which was received by SPS on October 27, 2014.  SPS signed the modification agreement on or about November 11, 2014.

X.  On or about October 26, 2014, the amount needed to pay off the Loan, had it not been modified, was $408,337.53.*

Y.  On or about November 1, 2014, RRReview conducted another BPO which reflected a "Quick Sale 'As Is'" value of $190,000 and a "90 - 120 Day 'As Is'" value of $210,000.*

Z.  Plaintiff is current on the payments on her Loan, as modified.

## IV. CLAIMS AND DEFENSES

**CLAIM ONE: Breach of Contract**

A.  Plaintiff contends:

   1.  On or about September 26, 2013 SPS obtained an appraisal of the property conducted through RRReview.  That appraisal showed the value of the property at $256,500.

   2.  On or about October 9, 2013, SPS wrote a letter to the Plaintiff in which it stated that the Plaintiff met the criteria required to apply for a new loan modification program, which had been created as a result of the national mortgage settlement.

   3.  The letter made the following representation and offer to the Plaintiff:

   > "*If you qualify* for this modification any past due fees *will be* waived, interest and advances that we paid on your behalf *will be* added to your principal balance, principal reduction *will be* applied and your loan *will be* brought current." (Emphasis added.)

   4.  The letter also contained the type or principal reduction the Plaintiff could anticipate.  In the letter, the principal reduction was nearly 43 % of the total loan balance.

   5.  The letter required the Plaintiff to send in information to SPS by October 24, 2013.

   6.  Upon getting the letter, the Plaintiff and her husband had the reaction that the loan modification was a "good deal."

   7.  The Plaintiff, working with her husband, used the letter as a template and did a calculation on what a loan modification under the NMS would mean to them.

8. In addition, on or about October 15, 2013 the Plaintiff's husband contacted SPS and the representative told him He said absolutely. He said according to our records, you file all you have to do is send in the appropriate documents and the form that we're requesting and we can give you that loan.

9. The Kwakes also discussed the interest rate in this call and was told that "the interest on the loan would go down to 2 to 3 percent."

10. The representative also explained in the call how the NMS worked in terms of reducing the principal balance.

11. The Kwakes then sent in the documents that were requested in the time allowed.

12. On or about December 3, 2013 SPS conducted a "NMS Denial Review." The review shows that the Plaintiff "Pass[ed]" meaning she did not qualify for the NMS.

13. On or about December 4, 2013, SPS sent a letter to the Plaintiff telling her she did not "qualify" for the program due to the fact that the loan amount was "not 100% or more of the value of the property."

14. In fact, the Plaintiff did qualify for the loan modification as the value of the property was below $388,000.

15. The Defendant breached its agreement with the Plaintiff to provide her with a NMS loan modification if she qualified.

16. The Plaintiff did qualify for the NMS loan modification.

17. The Defendant further breached its unilateral contract with the Plaintiff by not actually determining her qualifications for the NMS once she sent in her paper work.

18. The Plaintiff fully performed the conditions necessary to "qualify" to be provided with a loan modification that would reduce the principal of her loan.

19. As a direct result of SPS failing to perform on its agreement with the Plaintiff, the Plaintiff has been injured in the amount of approximately $313,944.04, plus prejudgment interest of 9%, plus her attorney fees, expenses, and all her costs under the terms of the Deed of Trust, as well as ORS 20.096.

B. Defendant contends:

1. SPS denies each of Plaintiff's contentions in Claim One.

2. Nothing in the Deed of Trust obligates SPS to offer a modification to Plaintiff or to modify Plaintiff's Loan.

3. SPS did not make Plaintiff any binding offer of contract relating to the NMS program. Plaintiff and SPS did not reach any agreement or contract relating to the NMS program.

4. Plaintiff did not qualify for a modification under the NMS program.

5. Plaintiff's breach of contract claim is barred by the statute of frauds, which prohibits Plaintiff from relying on oral communications to prove the existence of an enforceable contract to modify her loan.

6. Plaintiff's claim is barred because SPS administered the NMS program as an agent on behalf of BANA, the value used for the NMS eligibility review was provided by BANA, and/or because Plaintiff has waived and/or released this claim, including by entering into a Settlement Agreement with BANA.

7. Plaintiff is not entitled to attorney fees, expenses, and costs "under the terms of the Deed of Trust, as well as ORS 20.096." Plaintiff does not bring any claim for breach of the Deed of Trust.

**CLAIM TWO: Common Law Fraud**

A. Plaintiff contends:

1. On or about September 26, 2013, SPS obtained an appraisal of the property conducted through RRReview. That appraisal showed the value of the property at $256,500.

2. On or about October 9, 2013, SPS wrote a letter to the Plaintiff in which it represented that the Plaintiff met the criteria required to apply for a new loan modification program, which had been created as a result of the national mortgage settlement.

3. The letter made the following representation and offer to the Plaintiff:

> "If you qualify for this modification any past due fees will be waived, interest and advances that we paid on your behalf will be added to your principal balance, principal reduction will be applied and your loan will be brought current." (Emphasis added.) This statement was false or misleading because SPS did not actually qualify the Plaintiff for the NMS. SPS knew that Plaintiff would rely on the statement.

4. The letter also contained representations of the type of principal reduction the Plaintiff could anticipate. In the letter, the principal reduction was nearly 43 % of the total loan balance. These representations were false and misleading. SPS knew that the Plaintiff would rely on the representations and that they were false.

5. The Plaintiff working with her husband relied on the letter as a template and did a calculation on what a loan modification under the NMS would mean to them.

6.  In addition, on or about October 15, 2013 the Plaintiff's husband contacted SPS and the SPS agent represented to the Kwakes that the Plaintiff absolutely qualified for the NMS loan modification. The agent also represented that "according to our records, you file all you have to do is send in the appropriate documents and the form that we're requesting and we can give you that loan. These statements were false and misleading and SPS knew at the time they were made that they were false and that the Plaintiff would rely on them.[1]

7.  The Kwakes also discussed the interest rate in this call and the agent represented that "the interest on the loan would go down to 2 to 3 percent." These statements were false and misleading and SPS knew at the time they were made that they were false and that the Plaintiff would rely on them.[2]

8.  The agent also represented in the call how the NMS worked in terms of reducing the principal balance down to the current fair market value of the house.[3]

9.  On or about December 3, 2013, SPS conducted a "NMS Denial Review." The review shows that the Plaintiff "Pass[ed]" meaning she did not qualify for the NMS. This "review" was part of a policy and procedure which SPS employed to deny not only the Plaintiff the benefits of the NMS but many other customers of SPS the NMS. The "review" contains multiple false and misleading data points which drive to the certain

---

[1] SPS specifically objects to inclusion of this paragraph in the pre-trial order. This alleged representation and/or omission is not specifically pleaded as a basis for the common-law fraud claim alleged in the Second Amended Complaint (Dkt. #70).

The Plaintiff's legal position on this issue is that the "pretrial procedures established by the Federal Rules of Civil Procedure are intended to facilitate the precise definition of claims and defenses and permit a proper decision on the merits. The rules reject the idea that pleading is a game of skill where a misstep decisively affects the result. As set forth in Federal Rule of Civil Procedure 16, the primary purpose of the order which results from a pretrial conference is to govern the future progress of the case. Rule 16 is applicable to the United States Claims Court and to the Bankruptcy Court." 117 A.L.R. Fed. 515 (Originally published in 1994)

[2] SPS specifically objects to inclusion of this paragraph in the pre-trial order. This alleged representation and/or omission is not specifically pleaded as a basis for the common-law fraud claim alleged in the Second Amended Complaint (Dkt. #70).

[3] SPS specifically objects to inclusion of this paragraph in the pre-trial order. This alleged representation and/or omission is not specifically pleaded as a basis for the common-law fraud claim alleged in the Second Amended Complaint (Dkt. #70).

conclusion that the homeowner "pass[es]" the review, which means that they fail to get the NMS loan modification.[4]

10. On or about December 4, 2013, SPS sent a letter to the Plaintiff representing to her that she did not "qualify" for the program due to the fact that her loan amount was less than the value of the property." This representation was false and misleading and the Defendant knew at the time the representation was made that it was false and that the Plaintiff would rely on it.

11. The Plaintiff contested the use of the $388,000 valuation both in phone calls on 11/26/2013, 12/30/2013, 01/30/2014, and in writing in March of 2014.

12. The Defendant withheld a material fact from the Plaintiff. That material information was that SPS had in its file an appraisal on the property which showed it was worth $256,500.[5]

13. The property was not worth more than the loan amount it was worth less than the loan amount. The Defendant was aware of this fact when it represented to the Plaintiff that the home was worth more than the loan and for that reason the Plaintiff did not qualify for the NMS loan modification which provided for a reduction of principal.

14. On December 4, 2013 the Plaintiff got a letter from SPS which represented that "YOU MAY LOSE YOUR PROPERTY IF YOU DO NOT TAKE ACTION IMMEDIATELY." (Capitals in the original document.) This representation was false or misleading. This letter was sent in an effort to scare and intimidate the Plaintiff into believing she would lose her house if she did not comply with the demands of SPS.[6]

15. On December 9, 2013 the Plaintiff was sent a letter from SPS which stated that SPS "is now evaluating your loan for modification options including the new modification program that has been introduced as the result of the U.S. Department of Justice and State Attorney General nation settlement. **This modification could offer you significant principal reduction and low payments.**" (Emphasis from the original document.) This letter also gave the Plaintiff the false and continuing understanding that she was under continued consideration for the NMS. This representation was false

---

[4] SPS specifically objects to inclusion of this paragraph in the pre-trial order. This alleged representation and/or omission is not specifically pleaded as a basis for the common-law fraud claim alleged in the Second Amended Complaint (Dkt. #70).

[5] SPS specifically objects to inclusion of this paragraph in the pre-trial order. This alleged representation and/or omission is not specifically pleaded as a basis for the common-law fraud claim alleged in the Second Amended Complaint (Dkt. #70).

[6] SPS specifically objects to inclusion of this paragraph in the pre-trial order. This alleged representation and/or omission is not specifically pleaded as a basis for the common-law fraud claim alleged in the Second Amended Complaint (Dkt. #70).

or misleading. SPS knew it was false or misleading in that it had already denied the Plaintiff the NMS. SPS never actually considered the Plaintiff for the NMS loan modification.[7]

16. The Plaintiff contested the use of the $388,000 valuation both in phone calls and in writing between December 4, 2013 and March 17, 2014.

17. Subsequently to December 9, 2013, the Plaintiff received a series of requests for information and a series of solicitations for the loan modification. All these requests for information made it appear to the Plaintiff that she was under active consideration for the NMS when in fact she was not. SPS knew the Plaintiff was not in fact under consideration for the NMS and withheld this material fact from her.[8]

18. The Plaintiff complied with these requests.

19. Based on their protest, and the December 9, 2013 letter, along with phone conversations between December 2013 and March 2014, the Kwake's will testify that they relied on these representations and believed that this meant that they were still under active consideration for the NMS loan modification.

20. On March 17, 2014 the Plaintiff sent a letter to her lawyer contesting the values and providing her own values. All the values showed the value of the home to be lower than $388,000.

21. At a time currently unknown to the Plaintiff, the March 17, 2014 letter was forwarded to SPS.

22. On or about March 31, 2014, RRReview conducted a broker price opinion which showed the value of the property to be between $320,000 and $330,000. These efforts are set out in items 23 and 24 below.

23. On or about June 19, 2014, RRReview conducted another BPO and showed the value of the property to be between $190,000 and $210,000 and that the property needed approximately $10,000 in repairs.

24. On or about July 27, 2014, RRReview conducted another BPO and showed the value of the property to be between $320,000 and $330,000.

---

[7] SPS specifically objects to inclusion of this paragraph in the pre-trial order. This alleged representation and/or omission is not specifically pleaded as a basis for the common-law fraud claim alleged in the Second Amended Complaint (Dkt. #70).

[8] SPS specifically objects to inclusion of this paragraph in the pre-trial order. This alleged representation and/or omission is not specifically pleaded as a basis for the common-law fraud claim alleged in the Second Amended Complaint (Dkt. #70).

25. On or about September 26, 2014, the amount needed to reinstate the loan was $125,327.52

26. On or about October 11, 2014, SPS conducted a "Proposed Evaluation."

27. On or about October 22, 2014, the Plaintiff was sent the loan modification.

28. Based on the representations above that she did not qualify for the NMS, and that if she did not sign the loan modification presented to her she would lose her property, the Plaintiff signed the loan modification presented to her on or about October 24, 2014.

29. The Plaintiffs relied on and had the right rely on all the representations made by SPS as stated above.

30. The loan modification that the Plaintiff signed contained no reduction in principal and, in fact, has the long term effect of imposing two balloon payments on the loan totaling $313,944.04 at the end of 23 years. This is an amount in excess of the original loan.

31. Neither Plaintiff or Plaintiff's husband knew at the time they signed the current loan modification that there were two balloon payments due at maturity. The reason for this is that the wording in the loan modification agreement is misleading.[9]

32. On or about October 26, 2014 the amount needed to pay off the loan according to SPS was $408,337.53.

33. On or about November 1, 2014, RRReview conducted another BPO and showed the value of the property to be between $190,000 and $210,000 and that the property needed approximately $10,000 in repairs.

34. On January 9, 2015, SPS wrote to the Plaintiff telling her "you are in default under the terms of your mortgage." This representation was false and misleading and SPS knew of its falsity because the Plaintiff was current on her loan modification at the time SPS claimed she was in default.[10]

35. As a direct result of SPS' fraudulent conduct as described above the Plaintiff has been injured in the amount of approximately $313,944.04, plus $250,000 in emotional distress damages.

---

[9] SPS specifically objects to inclusion of this paragraph in the pre-trial order. This alleged representation and/or omission is not specifically pleaded as a basis for the common-law fraud claim alleged in the Second Amended Complaint (Dkt. #70).

[10] SPS specifically objects to inclusion of this paragraph in the pre-trial order. This alleged representation and/or omission is not specifically pleaded as a basis for the common-law fraud claim alleged in the Second Amended Complaint (Dkt. #70).

36. As described above, the acts of the Defendant were willful and wanton and were made with the knowledge of their falsity. The actions are also part of a pattern and practice of the Defendant to make false or misleading statements to homeowners for the purpose of reducing the amount of exposure it has on loans which have gone into default. The Plaintiff therefore seeks $5.07 million in punitive damages.

Defendant contends:

1. SPS denies each of Plaintiff's contentions in Claim Two.

2. Plaintiff did not qualify for a modification under the NMS program. SPS did not make any fraudulent statements relating to the NMS program or Plaintiff's Loan, and Plaintiff has not identified any false statement on which she had a right to rely.

3. Plaintiff's claim is barred because SPS administered the NMS program as an agent on behalf of BANA, the value used for the NMS eligibility review was provided by BANA, and/or because Plaintiff has waived and/or released this claim, including by entering into a Settlement Agreement with BANA.

4. Plaintiff's claim is barred in whole, or in part, by the two-year statute of limitations for her fraud claim.

5. Plaintiff has not demonstrated any basis for recovery of punitive damages. Plaintiff has not identified any basis for recovery of attorney fees on Claim 2.

**CLAIM THREE: Violation of Oregon Unfair Trade Practices Act.**

A. The Plaintiff re-alleges paragraphs 1 through 36 above and further contends as follows:

1. The Defendant, acting within the course of their business, did within the State of Oregon sell or offer to sell services that are covered by ORS § 646.605, 646.607, ORS § 646.608(1)(u), and OAR 137-020-0805, and the services were primarily used for personal, family or household purposes. Specifically, SPS held itself out as offering loan modifications, which are an extension of credit under the OUTPA. These offers of loan modifications were made to the Plaintiff after 2010.

2. The Defendant did willfully or negligently engage in the conduct more specifically described in Sections A and B above in violation of ORS § 646.607, ORS § 646.608(1)(u), and OAR 137-020-0805.

3. More specifically, Defendant SPS, contrary to what it has represented to Plaintiff and the public, lack any financial incentive to modify the loans of homeowners.

4. For the purpose of increasing the fees and other consideration owed by Plaintiff, and before they attempted to foreclose on the Property, Defendant SPS, acting alone or in

        concert with other entities that it controls, induced the Plaintiff to believe that they did not qualify for the NMS.

5. At all material times, SPS acted knowingly, willfully, maliciously, and with a reckless and outrageous indifference to a highly unreasonable risk of harm and a conscious indifference to the health, safety, and welfare of the Plaintiff.

6. The Plaintiff also sustained an ascertainable loss in the form of fees paid to copy, fax and express mail material to the SPS.

7. The Plaintiff is therefore entitled to the greater of: actual damages of 313,944.04, plus punitive damages of $5.07 million, together with her attorney's fees and costs pursuant to the statute and pursuant to the Note and Deed of Trust, as well as ORS 20.096, and expenses and any equitable relief the court considers necessary or proper, OR $200 pursuant to ORS § 646.638(1).

B.     Defendant contends:

1. SPS denies each of Plaintiff's contentions in Claim Three.

2. Plaintiff did not qualify for a modification under the NMS program. SPS did not make any misrepresentation regarding Plaintiff's eligibility for a loan modification under the NMS program or any other programs.

3. Plaintiff's claim is barred because SPS administered the NMS program as an agent on behalf of BANA, the value used for the NMS eligibility review was provided by BANA, and/or because Plaintiff has waived and/or released this claim, including by entering into a Settlement Agreement with BANA.

4. Plaintiff has not demonstrated any basis for recovery of punitive damages or any equitable relief.

7. Plaintiff is not entitled to attorney fees, expenses, and costs, including "pursuant to the Note and Deed of Trust, as well as ORS 20.096" as Plaintiff does not bring any claim for breach of the Deed of Trust.

## V. OTHER LEGAL ISSUES

### A. PLAINTIFF'S STATEMENT

The Plaintiff has identified the following legal issue, but reserves (and expressly does not waive) the right to raise additional legal issues pre-trial, including in motion in limine. In the Plaintiff's view there is only one major additional legal issue in the case that is not before the Court on Summary Judgment. That issue is the role that Bank of America played. Defendant seems poised to "point to the empty chair" and put as much legal liability as possible (read all) on BANA knowing it has been released. There are several problems with this legal position from the stand point of the Plaintiff. First, "it is well settled that an agent who fails to disclose the identity of his principal at the time of entering into a contract with a third person may be held personally liable therein. *Porter Const. Co. v. Berry* et al., 136 Or. 80, 298 P. 179; *Cobb v. Knapp*, 71 N.Y. 348, 27 Am.Rep. 51; 2 Am.Jur., Agency, § 404. Even though the plaintiff in this case might have known that the defendant was acting in a representative capacity, it was not plaintiff's duty to seek out the identity of the principal. The duty to disclose the identity of the principal was on the defendant. A subsequent discovery by the plaintiff as to the identity of the principal would not relieve the defendant of liability. 3 C.J.S., Agency, § 216(b). *Willamette Tug & Barge Co. v. Commercial Dispatching Corp.*, 180 Or. 657, 662–63, 178 P.2d 698, 701 (1947). In this case, there is ample evidence that not only was the prior servicers role undisclosed, it was in fact hidden.

Under this analysis the actions or inactions of Bank of America in this case are totally irrelevant. The issue should not be considered or even be made known to the jury.

Second, in the Plaintiff's view, the Defendant has made an effort to argue in the Summary Judgment Motion that SPS was released along with Bank of America. As the Plaintiff has explained in its Surreply a plain reading of the release is counter to this argument. The Plaintiff believe this issue is best determined as a matter of law prior to trial.

### B. DEFENDANT'S STATEMENT.

SPS denies Plaintiff's statement of the remaining legal issues. SPS has identified the following legal issues below, but reserves (and expressly does not waive) the right to raise additional legal issues pre-trial, including in *motion in limine*.

**1. Pending Summary Judgment Motion.** Pending before the Court is Plaintiff's Motion for Summary Judgment [Dkt. #57]. SPS will not repeat the arguments in that motion here, but resolution of that motion may narrow the issues for trial or eliminate the need for trial.

**2. Relationship of SPS and BANA, and Impact of BANA Settlement Agreement.** The following information is relevant to SPS's defenses to Plaintiff's claims. BANA was a participant in the NMS program; SPS was not. However, loans that SPS subserviced for BANA,

including Plaintiff's loan, were eligible for consideration under the NMS programs pursuant to the guidelines provided by BANA.  As such, SPS acted as BANA's agent in evaluating Plaintiff for the NMS program and was required to follow the instructions of BANA as its principal.  In the Confidential Settlement Agreement and General Release (the "SRA") between Plaintiff and BANA, Plaintiff specifically releases BANA and its "agents" from all suits, claims, demands, etc., "known or unknown" relating in any way to Plaintiff's loan before November 6, 2014.

BANA's decision to use the $388,000 value for Plaintiff's NMS modification review and Plaintiff's denial of a modification under that program occurred on or about December 4, 2013 -- nearly one year before the effective date of the SRA.  Therefore, because SPS was acting as BANA's agent for purposes of the NMS program, Plaintiff's claims against SPS based on her denial of a modification under that program were released.

The language in the SRA stating that the SRA "does not release any claims the Borrower may have against [SPS]," does not change this analysis.  That reservation can necessarily apply only to claims Plaintiff may have against SPS based on SPS' independent actions as a sub-servicer, not actions based on its agency relationship with BANA.  The next sentence confirms that interpretation since is expressly states that Plaintiff has no right to sue any "Bank Releasee(s)," which includes BANA's agents, and that Plaintiff does not have any right to sue SPS beyond those she would otherwise have.  Allowing her to bring claims against SPS stemming from its agency relationship with BANA is "beyond those she would otherwise have."

## VI. AMENDMENTS TO PLEADINGS

### A.    PLAINTIFF'S STATEMENT

The only amendment that the Plaintiff is contemplating at this point is to reorder the claims.  The Plaintiffs would put the OTPA claim first, then the contract claim and finally the fraud claim.  It might be easier to instruct the jury on the burden of proof if that claims were put in order of "lower" to "higher" burden of proof of the claims.

### B.    DEFENDANT'S STATEMENT

Plaintiff filed her Third Amended Complaint on January 13, 2017.  SPS intends to answer that Third Amended Complaint by the deadline.  SPS disagrees that any further amendments are necessary or allowed, as Plaintiff has already taken advantage of multiple opportunities to amend.

SPS also renews its objections made in the footnotes throughout this Pre-Trial order, and specifically objects to any attempt by Plaintiff to implicitly amend her fraud claim, a claim she is required to plead with particularity, through the inclusion of additional content in the pre-trial order that was not specifically pleaded in her Third Amended Complaint, and therefore not subject to discovery or litigation to date.  *Wilson v. Terrell*, 303 F.3d 1207, 1215-16 (10th Cir. 2002) (while "'the pretrial order is treated as superceding the pleadings and establishing the

issues to be considered at trial,' . . ., [a court] do[es] not normally expect to see claims or defenses not contained in the pleadings appearing for the first time in the pretrial order, especially in such cursory form. Such a practice deprives one's adversary of fair notice, possibly discovery, and the opportunity for motion practice, and is subject to abuse by those who employ a sporting theory of justice.") SPS requests that the Court remove those statements by interlineation and/or decline to approve those statements as part of its approval of the pretrial order.

DATED this 20th day of January 2017.

STOEL RIVES LLP

/s/ Terry Scannell
TERRY SCANNELL
OSB NO. 853220
Telephone: (503) 789-6566

Attorneys for Plaintiff Terri Kwake

/s/ Amy Edwards
AMY EDWARDS
OSB NO. 012492
Telephone: (503) 294-9586

Attorneys for Defendant Select Portfolio Servicing, Inc.

---

The foregoing Pretrial Order is:

______ Approved as lodged..

______ Approved as amended by interlineation.

SO ORDERED this _____ day of ___________, 2017.

____________________________________

Hon. Michael J. McShane
Judge, United States District Court